UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
NPS LLC,                        )
                               )
      Plaintiff,               )
                               )        CIVIL ACTION NO.
v.                             )        08-11281-DPW
                               )
AMBAC ASSURANCE CORPORATION,   )
                               )
      Defendant.               )
```

MEMORANDUM AND ORDER
June 3, 2016

I have granted summary judgment in favor of defendant Ambac
Assurance Corporation ("Ambac") on its breach-of-contract
counterclaim against plaintiff NPS LLC ("NPS").  *See NPS LLC* v.
*Ambac Assurance Corp.*, 706 F. Supp. 2d 162 (D. Mass. 2010).  The
issues remaining before me now in this matter are those of the
damage amount and the amount of attorneys' fees and costs due
Ambac under the parties' 2006 Insurance Agreement (the
"Agreement").

The parties are prepared to stipulate to the amount due
Ambac for the breach of the contract I have found and to the
method for calculating pre-judgment interest.  They dispute and
have submitted opposing briefs on the question of attorneys'
fees and costs.  After resolving that attorneys' fees and costs
question, I will direct the parties to submit an agreed upon
prejudgment interest figure bringing prior calculations up to
the anticipated June 17, 2016 date for entry of final judgment

in an amount certain for Ambac based upon and incorporating the fee and cost determinations reflected in this Memorandum.

## I. BACKGROUND

NPS, an affiliate of the New England Patriots, issued $282 million of long-term bonds in 2000 in order to fund the construction of Gillette Stadium.  NPS obtained financial guaranty insurance for its bonds from Ambac.  In 2006, NPS refinanced the bonds, and issued new thirty-year bonds.  NPS again sought and obtained financial guaranty insurance from Ambac.  The 2006 Agreement between the parties included a Guaranteed Premium provision providing that "if the Offered Securities are paid in full or the Policy is terminated for any reason prior to January 1, 2017, the Issuer shall nevertheless pay to Ambac, upon such final payment date or termination date, the present value, using a discount rate of 7%, of each of the Annual Premiums scheduled to be paid from and including such date until January 1, 2017 . . . ." (Compl., Ex. B, § 1.02 [hereinafter "Agreement"].)

Following the crash of the housing market and ensuing credit crisis in late 2007 and early 2008, national credit rating agencies placed a negative outlook warning on Ambac's AAA or Aaa credit rating.  Within six months, the agencies downgraded Ambac's credit rating.  In February 2008, NPS's bonds,

which were auction-rate bonds sold weekly or monthly,
experienced a failed auction, which increased considerably the
interest rate payable on the bonds.  In May 2008, NPS decided to
redeem the bonds in full, thereby triggering the Guaranteed
Premium provision of the Agreement.  NPS subsequently refused to
pay the Guaranteed Premium, and, on July 2, 2008, Ambac sent NPS
a demand letter giving notice of default under the Agreement.
DLA Piper US LLP ("DLA Piper"), which had provided counsel to
Ambac during the 2006 insurance transaction, assisted Ambac in
this attempt to recover the monies owed under the Guaranteed
Premium provision.

NPS filed suit against Ambac in Massachusetts Superior
Court on July 8, 2008, alleging eight counts, including breach-
of-contract claims, negligent and intentional misrepresentation,
and a violation of Massachusetts's consumer protection act, Mass.
Gen. Laws ch. 93A.  The crux of NPS's action was that Ambac had
misrepresented the security of its high credit rating at the
formation of the 2006 Agreement.  Shortly following the filing
of the complaint, Ambac engaged the New York firm of Patterson
Belknap Webb & Tyler LLP ("Patterson Belknap") to handle the
litigation.  After engaging Patterson Belknap, DLA Piper was
largely inactive in its representation of Ambac in this case.
However, because Patterson Belknap has no presence in this

federal judicial district, Ambac also hired the Boston office of McDermott Will & Emery LLP ("McDermott") to act as local counsel.

After Ambac successfully removed the case to this court, it filed an answer to NPS's complaint and counterclaimed for breach of contract, seeking to enforce the Guaranteed Premium provision.  The parties then embarked on a rocky road of negotiations and discovery that was both highly contentious and far-reaching in scope.  In addition to party discovery, Ambac served subpoenas on related and unrelated third parties, including Goldman Sachs, Inc., the National Football League, New England Patriots, L.P., Kraft Family, Inc., Kraft Group LLC, and Bingham McCutcheon LLP.  The parties clashed as to both the scope and format of discovery, exchanging a number of letters in failed attempts to compromise and coordinate.  Following receipt of NPS's request for discovery on December 22, 2008, Ambac decided to move for summary judgment and seek a stay of party discovery.  NPS refused to agree to any such stay.  Ambac subsequently filed motions to stay party discovery — but not third party discovery — and for summary judgment on all counts including its own counterclaim.  Both motions were granted in full, and upon granting summary judgment in favor of Ambac on its counterclaim, I directed the parties to submit a joint

4

statement regarding the amount owed under the Guaranteed Premium provision and to brief the issue of attorneys' fees and expenses due to Ambac under the Agreement.

## II. ANALYSIS

In a joint statement, the parties have agreed that, based upon my resolution of the question of liability, the balance due Ambac under the Guaranteed Premium provision is $2,740,432.18, plus interest as accrued thereafter under § 2.03 of the Agreement.  Accordingly, I will adopt the balance due figure approved of by the parties and enter judgment for Ambac incorporating that amount.

However, the parties were unable to come to a similarly non-contentious resolution on the issue of attorneys' fees due Ambac.  As a result of its engagement of Patterson Belknap; McDermott; and DLA Piper, Ambac seeks a total of $683,897.95 in attorneys' fees and expenses.[1]  NPS contests this amount as unreasonable and excessive.

Section 1.03 of the parties' Agreement states that NPS "will pay all costs and expenses incurred by Ambac in connection with

---

[1] In total, DLA Piper billed Ambac $24,028 for expenses and 32.8 hours of attorneys' time.  Patterson Belknap billed Ambac $548,798.16 for 1162 hours and $57,735.11 in expenses. McDermott billed Ambac, through Patterson Belknap, $53,039.95 for 91.4 hours and expenses.

the enforcement of this Agreement (including, without limitation, all reasonable fees and disbursements of Ambac's counsel)." Such a contractual provision for attorneys' fees and expenses is valid under New York law,[2] *A.G. Ship Maint. Corp.* v. *Lezak*, 503 N.E.2d 681, 683 (N.Y. 1986) (*per curiam*), and neither party disputes that Ambac is entitled to reasonable attorneys' fees and costs related to this litigation.  *See also Diamond D Enters. USA, Inc.* v. *Steinsvaasg*, 979 F.2d 14, 18 (2d Cir. 1992) (finding that a contractual attorneys' fee provision includes recovery for all reasonable expenses incurred by enforcing the contract and addressing related counterclaims or affirmative defenses).

Under New York law, "[a]n award of attorneys' fees pursuant to . . . a contractual provision may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered." *M. Sobol, Inc.* v. *Wykagyl Pharmacy, Inc.*, 723 N.Y.S.2d 88, 89 (N.Y. App. Div. 2001) (citation and quotation marks omitted).  Consequently, I must determine whether Ambac's request for $683,897.95 in attorneys' fees and expenses is a reasonable award given the circumstances

---

[2] I found in my prior memorandum and order regarding the merits in this case that New York law governs the interpretation of the Agreement.  *See Ambac Assurance Corp.*, 706 F. Supp. 2d at 168.

of the case.  *See Diamond D Enters. USA, Inc.*, 979 F.2d at 19

("[T]he rule in New York is that when a contract provides that

in the event of litigation the losing party will pay the

attorney's fees of the prevailing party, the court will order the

losing party to pay whatever amounts have been expended by the

prevailing party, so long as those amounts are not

unreasonable." (citation and internal quotation marks omitted)).

In making my determination, I must take into account the "value

of legal services" provided, that is, "the nature and extent of

the services, the actual time spent, the necessity therefor, the

nature of the issues involved, the professional standing of

counsel, and the results achieved."  *542 E. 14th Street LLC* v.

*Lee*, 883 N.Y.S.2d 188, 192 (N.Y. App. Div. 2009) (quotation

marks and citation omitted).  Ultimately, the award of

reasonable attorneys' fees under a contractual attorneys' fees

provision is "within the sound discretion of the trial court."

*Ebrahimian* v. *Long Island R.R.*, 703 N.Y.S.2d 731, 732 (N.Y. App.

Div. 2000); *see also First Nat'l Bank of E. Islip* v. *Brower*, 368

N.E.2d 1240, 1242 (N.Y. 1977) (recognizing that the court's

authority and discretion in determining attorneys' fee awards

extends to contractual attorneys' fees provisions).

    The parties' costs of litigating this case were

dramatically different.  Ambac requests $683,897.95 in

attorneys' fees and expenses, while NPS maintains that its own litigation costs were a comparably modest $357,115.06.  I will address each of the arguments made by NPS in turn to determine whether Ambac's requested amount is reasonable under § 1.03 of the Agreement.

**A.   *Engagement of Multiple Firms***

NPS first argues that Ambac unnecessarily engaged three large law firms, including two expensive, out-of-district firms from New York.  NPS contends that this seemingly redundant representation was unreasonable and that any attorneys' fees and expenses claimed on behalf of the representation by DLA Piper and McDermott should be excluded.  NPS's argument presents two distinct questions: one concerning redundant and repetitive representation by out-of-district counsel (DLA Piper) and the other regarding the retention of duplicative representation as local counsel (McDermott).

1.   DLA Piper

NPS redeemed its bond obligations in full on May 16, 2008, thereby triggering the Agreement's Guaranteed Premium provision. Soon thereafter, NPS refused to honor its obligations under § 1.02.  Following NPS's resulting default, Ambac sought DLA Piper's assistance in enforcing the Agreement.  DLA Piper had acted as Ambac's transaction counsel in the 2006 refinance,

including the Agreement.  More than half of DLA Piper's services
in this matter pre-dated the filing of NPS's complaint and
related to the demand letter sent by Ambac to NPS on July 2,
2008.  Given NPS's breach of the Agreement, it is not
unreasonable that Ambac turned first to the law firm that had
represented it during the negotiation of the document in
question.  Furthermore, although DLA Piper's New York rates are
considerably higher than those common in this district, DLA
Piper's unique relationship to the Agreement justifies their
retention over equally competent, but less expensive, counsel in
this district, who would have had to expend additional hours
familiarizing themselves with the document on an expedited basis
at the outset of the dispute.  I therefore find the $14,594.75
incurred by Ambac for DLA Piper's services addressing NPS's
default prior to formal initiation of this litigation to be
reasonable and reimbursable under § 1.02 of the Agreement.

     After NPS filed its complaint, DLA Piper billed a further
12.3 hours in this matter, all but 2.2 hours by partners whose
rates ranged from $700 to $825.  Of those additional hours, 7.8
were recorded in the days directly following NPS's filing and
included reviewing the complaint, researching removal of the
case, and consulting with Patterson Belknap, Ambac's litigation
counsel.  DLA Piper's lead partner, Michael Barz, billed a

further 3.7 hours in August 2008 consulting with the lead
partner from Patterson Belknap regarding Ambac's draft answer and
1.8 hours in October 2008.  Given the nature of the case, this
amount of time transitioning to and consulting with litigation
counsel seems appropriate and not excessive.  Furthermore, the
minimal representation provided by DLA Piper would have been
necessary whether Ambac had transitioned to out-of-district
counsel like Patterson Belknap or to equivalent in-district
counsel in Boston.  I accordingly find that the additional
$9,433.25 billed by DLA Piper in this matter constitutes
reasonable attorneys' fees recoverable under § 1.02 of the
Agreement.

> 2.   McDermott

NPS argues that Ambac unnecessarily incurred costs by
hiring out-of-district counsel that in turn required engagement
of an additional, third firm to act as local counsel.  Given
that NPS's complaint involved relatively straightforward contract
claims and various tort and consumer protection causes of
action, I find NPS's contention not without force.

There is a presumption in New York law in favor of basing
reasonable attorneys' fees on the rates within the forum
district. *See Getty Petroleum Corp.* v. *G.M. Triple S. Corp.*, 589
N.Y.S.2d 577, 578 (N.Y. App. Div. 1992) (memorandum decision).

Ambac argues that it overcomes this presumption in hiring Patterson Belknap because that firm is in Ambac's own district, has represented Ambac previously, and was representing Ambac on other similar matters in other fora.  While Ambac made a business judgment that, in this context, the additional convenience of engaging Patterson Belknap outweighed the additional costs associated with hiring local counsel, it is not necessarily reasonable to make NPS adopt all the extra costs incurred for Ambac's own convenience.  *See Fed. Land Bank of Springfield, Mass*. v. *Ambrosano*, 453 N.Y.S.2d 857, 859 (N.Y. App. Div. 1982) (memorandum decision) ("[W]hile plaintiff may employ counsel of its own choosing, its recovery of attorneys' fees under a provision in the agreement . . . is subject to the traditional power of the court to supervise the charging of fees for legal services.").

The invoices and declaration provided by Edward Leibensperger, lead partner on the matter for McDermott, suggest that the services McDermott provided were to a significant degree duplicative and redundant.  McDermott attorneys spent the overwhelming majority of the 41.7 invoiced hours[3] reviewing

---

[3] According to the Leibensperger Declaration, McDermott billed Patterson Belknap a total of $53,336.68 in fees and expenses associated with this case.  He states that McDermott attorneys and staff spent 91.4 hours on the matter.  However, the invoices

documents prepared by Patterson Belknap and emailing or

teleconferencing with Patterson Belknap attorneys.  Thus, had

Ambac hired counsel from within the District of Massachusetts —

or hired out-of-district counsel with a presence in this

district — it could have minimized the significant fees charged

by both McDermott and Patterson Belknap for performing

essentially the same tasks (*e.g.*, reviewing the same pleadings,

participating in conference calls with each other, attending

mediation and oral argument, etc.).  In essence, Ambac seeks to

impose duplicative expenses onto NPS.  Ambac may have considered

such duplicative representation to be useful and may have been

willing to pay for it.  But under New York law, shifting costs

is not automatic.  *See, e.g.*, *Daiwa Special Asset Corp.* v.

---

submitted only cover services provided between November 11,
2008, and April 8, 2010, totaling 41.7 hours (less than half of
the requested hours for McDermott).  Those detailed invoices
amount to $26,835.50 in attorneys' fees and $168.73 in costs (a
total of $27,004.23).  These invoiced amounts, together with
three prior invoices listed as unpaid on the November 30, 2008
bill, total $53,372.96, or $36.28 less than the amount reported
by Leibensperger in his declaration.  Additionally, one page of
the February 13, 2009 invoice was missing.  Because Ambac only
undertook to provide a detailed accounting of $27,004.23 in fees
and expenses, I will only consider whether those charges were
reasonable; I will not consider awarding an amount above the
documented fees.  *M. Sobol, Inc.* v. *Wykagyl Pharmacy, Inc.*, 723
N.Y.S.2d 88, 89 (N.Y. App. Div. 2001).  As will appear, I will,
however, use the documented fees as a sampling from which to
draw a percentage award for the total of the local services
reported, if not fully documented, by McDermott.

*Desnick*, No. 00 Civ. 3856(SHS), 2002 WL 31767817, at *3 (S.D.N.Y. Dec. 3, 2002) ("The attorneys' fees are excessive, in part, because the time spent by so many individuals familiarizing themselves with the file is considerable.").

Accordingly, I will allow only 20 percent of the total claimed fees and costs requested by Ambac for services rendered by McDermott as reasonable attorneys' fees recoverable under § 1.03 of the Agreement.  This reduction is meant to estimate an appropriate level of compensation for local counsel – after all, local counsel can be a necessity, and in any event McDermott's time surely substituted for some amount of work by Patterson Belknap lawyers even as it duplicated other work – while substantially discounting for the duplication inherent in retaining separate law firms for a single matter.  I will also discount the expenses billed by Patterson Belknap for travel to and from New York by Patterson Belknap attorneys (including fees for non-working travel) and for courier service to McDermott, approximately $13,506.31.[4]  Finally, I will reduce by two percent the attorneys' fees requested for Patterson Belknap for the time

---

[4] The deducted fees for non-working travel were calculated according to the reasonable hourly rates of the two lawyers involved, as explained below.  *See infra* Part II.B.1.  David Dykhouse billed 12.8 hours ($8,409.60) and Nivritha Ketty billed 3.5 hours ($1,281).  (Am. Ex. A at 22-23, 37, 98.)

spent updating and coordinating with McDermott's attorneys.

**B.    *Reasonable Rates and Hours***

The bulk of the fees and expenses associated with this
litigation and requested by Ambac was billed by Patterson
Belknap, Ambac's lead litigation counsel.  Excluding costs
incurred from the McDermott and DLA Piper representations, the
cost of this litigation to Ambac was a reported $606,533.27
($548,798.16 in fees and $57,735.11 in expenses).  By contrast,
Bingham McCutcheon LLP, NPS's sole counsel in this matter, billed
$337,445.70 in fees and $19,669.36 in expenses, for a total
litigation cost of $357,115.06.  NPS argues that the much higher
costs incurred by Ambac were unreasonable and expends a great
deal of effort calculating and identifying the reasons for the
nearly $250,000 difference in costs to the two parties.  In sum,
NPS contends that the out-of-district rates inflated the fees,
that Ambac unreasonably and inefficiently staffed the matter,
and that Ambac engaged in unnecessarily broad discovery.  For
all of these reasons, NPS contends that Ambac's requested
attorneys' fees should be reduced accordingly.

New York law dictates that "[a]n award of attorneys' fees
pursuant to . . . a contractual provision may only be enforced
to the extent that the amount is reasonable and warranted for
the services actually rendered."  *M. Sobol, Inc.*, 723 N.Y.S.2d

14

at 89.  Thus, "[a]pplications for fee awards should generally be
documented by contemporaneously created time records that
specify, for each attorney, the date, the hours expended, and
the nature of the work done."  *Disabled Patriots of Am., Inc.* v.
*Niagara Grp. Hotels, LLC*, 688 F. Supp. 2d 216, 226 (W.D.N.Y.
2010) (quoting *Kirsch* v. *Fleet Street, Ltd.*, 148 F.3d 149, 173
(2d Cir. 1998)).  As recited earlier, in considering whether
Patterson Belknap's fees and expenses were reasonable, I must
take into consideration "the nature and extent of the services,
the actual time spent, the necessity therefor, the nature of the
issues involved, the professional standing of counsel, and the
results achieved."  *542 E. 14th Street LLC*, 883 N.Y.S.2d at 192.
I will use Patterson Belknap's copious invoices as a baseline and
award attorneys' fees as actually expended unless I find those
fees to be unreasonable.  *See Diamond D Enters. USA, Inc.*, 979
F.3d at 19.

    In undertaking this inquiry, "courts have acknowledged that
a judicial determination of what is 'reasonable' for purposes of a
fee award to be paid by the losing party to the prevailing party
in a litigation is not the same as the reasonableness of a bill
that a law firm might present to its own paying client."  *Daiwa
Special Asset Corp.*, 2002 WL 31767817, at *2.  To that end,
"[w]hatever the terms of the private agreement between attorney

and client, it is not required that [the losing party] be
required to sign on to that agreement by the virtue of his
guaranty to pay 'reasonable' fees and expenses." *Id.*

### 1.   Reasonable Rates

NPS contends that Patterson Belknap's fees were excessive
New York-based fees and should be heavily discounted.  Ambac
disagrees and argues that engaging more expensive, out-of-
district counsel was appropriate in this case because Patterson
Belknap had a long-term relationship with Ambac and was familiar
with the businesses of Ambac and its affiliates.  However, as I
have already indicated in Part II.A.2 of this memorandum, I am
not entirely convinced that the hiring of out-of-district
counsel was necessary or reasonable in this case.  Although
Ambac correctly points out that its counsel was successful at
every stage of this litigation (in its motions for removal, for
stay of party discovery, and for summary judgment) and is
plainly well-respected and experienced in the field,
equivalently experienced and competent in-district counsel was
available to Ambac, albeit with some - but not disabling -
inconvenience.  Ambac is also correct that the stakes in this
case were high — both in terms of the millions of dollars in
damages sought by NPS and the potential impact that Ambac's
failure in this case would have on its business more generally —

but, at its essence, this was not a complicated breach-of-contract case.  Special knowledge of Ambac's larger business was not that difficult to develop, nor was Patterson Belknap particularly familiar with the Agreement itself (as evidenced by DLA Piper's initial involvement in this case).  Ambac's justifications for hiring Patterson Belknap are therefore not particularly compelling in this context.

Consequently, I must examine Patterson Belknap's rates and determine whether they are reasonable for this district.  *See Getty Petroleum Corp.* v. *G.M. Triple S. Corp.*, 589 N.Y.S.2d 577, 578 (N.Y. App. Div. 1992) (memorandum decision) ("[T]he reasonable hourly rate should be based on the customary fee charged for similar services by lawyers in the community with like experience and of comparable reputation to those by whom the prevailing party was represented."); *DaimlerChrysler Corp.* v. *Karman*, 782 N.Y.S.2d 343, 346 (N.Y. Sup. Ct. 2004) ("The fact remains that this proceeding was litigated in Albany County, which is in the Northern District, and, therefore, the rates for attorney services that would be charged in this community must apply." (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 369 F.3d 91 (2d Cir. 2004))).

NPS estimates that Ambac's counsel charged an average of $91.79 per hour more than NPS's in-district counsel.[5]  My calculations are quite different.  First, the attorneys from DLA Piper on average billed at a higher rate than Patterson Belknap, and McDermott (in-district counsel) charged only minimally lower rates.  McDermott's rates were $795 for its senior-most partner, as opposed to $825 for Patterson Belknap's, and $470 for a mid-level associate equivalent to Matthew Larsen at Patterson Belknap, who billed at $474.

It is indisputable, however, that Patterson Belknap's rates were higher on average than Bingham McCutcheon's rates for NPS. As a caveat, it is unclear to me whether Bingham McCutcheon charged NPS customary rates or some discounted rate.  Given the odd numbers quoted by Bingham McCutcheon, I am inclined to suspect the latter.  In any case, the following summarizes the average fees of the two firms as charged in this matter, according to roughly equivalent seniority:

---

[5] Ambac argues that it is improper to use NPS's costs as a comparison or an example of "reasonable fees."  I agree that Bingham McCutcheon's invoices are not necessarily the touchstone for measuring Patterson Belknap's purported excesses.  However, as a well-regarded in-district firm at the time, Bingham McCutcheon rates provide considerable insight into what the Boston legal market was bearing for comparable services at the time.

| Patterson Belknap Attorney | Hourly Rate[6] | Bingham McCutcheon Attorney[7] | Hourly Rate |
|---|---|---|---|
| *Partners* | | | |
| Forlenza | $825 | Bernstein | $720 |
| Dykhouse | $730 | Goldberg | $688.50 |
| | | Solomont | $548.25 |
| *Associates* | | | |
| Syme | $546 | | |
| Larsen | $474 | Guizzetti | $395.25 |
| Ketty | $366 | Rowley | $293.25 |
| Staff | $172 | Staff | $196 |

---

[6] These rates represent estimated weighted averages.  Patterson Belknap charged standard hourly rates until January 5, 2009.  Therefore, 672.5 hours were billed at the standard rates, and 480.5 hours at a discounted rate.  Additionally, rates for several of the attorneys increased due to annual promotions.  I have calculated the weighted average wage per hour of each attorney based on the rate changes over time.

[7] It should be noted that the equivalencies of the attorneys appearing in the same row are not exact.  The attorneys are paired according to approximate years of experience, in descending order.  Attorneys who billed only minimal hours are not included, with the exception of Mr. Forlenza, who was the senior-most attorney from Patterson Belknap but billed only 0.9 hours.

The average difference here, therefore, is less than the $92.79
quoted by NPS, but still significant at $75.

Given the comparison between the rates reported by
McDermott, Bingham McCutcheon, and Patterson Belknap, I am
satisfied that Patterson Belknap's rates are unreasonable for
comparable representation in this district.  I therefore find it
necessary to reduce the rates.  This, of course, is not a
statutory attorneys' fees case in which I must gauge
reasonableness on the least amount necessary to attract
competent counsel.  *See Boulet* v. *Romney*, No. Civ.A. 99-10617,
2003 WL 1538374, at *1 (D. Mass. Mar. 24, 2003) (recognizing the
difference between the market rates for commercial and civil
rights litigation, with the former substantially greater than
the latter); *515 Avenue I Corp.* v. *515 Avenue I Tenants Corp.*,
No. 65/05, 2010 WL 4904671, at *3 (N.Y. Sup. Ct. Dec. 1, 2010)
("[T]here is a danger in incorporating wholesale into
contractual fee-shifting the methodology developed, at least
initially, in the context of attorneys' fees awards under the
Federal civil rights laws with the purpose 'to attract qualified
and competent attorneys without affording any windfall to those
who undertake such representation.'" (citations omitted)).  This
is, by contrast, a contract dispute regarding a sophisticated

insurance agreement entered into by sophisticated parties, both of whom, not surprisingly, hired sophisticated counsel to resolve the dispute.  The rates should reflect this reality.

Indeed, in its briefing, NPS suggested that Ambac should have hired McDermott to litigate this matter instead of hiring expensive New York counsel.[8] Of course, had Ambac done so, its attorneys' fees request would likely have been significantly lower than that which it seeks now.  However, Patterson Belknap's representation was well above average and, ultimately, entirely successful.  Accordingly, I will reduce the above-listed weighted average rates by ten percent to calculate the reasonable attorneys' fees due Ambac.  I see no reason to reduce the fees charged for paralegals, IT professionals, and other support staff.  The reduced fee schedule is:

---

[8] I note that I have already indicated a determination to reduce the award by eliminating unnecessarily redundant McDermott charges.  I have chosen to do so to honor Ambac's choice of principal counsel without at the same time burdening NPS with redundant fees, albeit at a lower cost.

| Patterson Belknap Attorney | Weighted Average Hourly Rate | Reduced Hourly Rate |
|---|---|---|
| *Partners* | | |
| Forlenza | $825 | $742.50 |
| Dykhouse | $730 | $657 |
| *Associates* | | |
| Syme | $546 | $491.40 |
| Larsen | $474 | $426.60 |
| Devine | $440 | $396 |
| Ketty | $366 | $329.40 |
| Staff | $172 | $172 |

Because NPS also contends that the number of hours expended by Patterson Belknap's attorneys is excessive and unreasonable, I will not calculate the total fees due according to these reduced rates until I address the issue of reasonable hours.

    2.   Reasonable Hours

    Comparing the hours billed by Patterson Belknap to those billed by Bingham McCutcheon results in a difference as divergent as the comparison of the firms' respective hourly rates.  Patterson Belknap billed 1162 hours; Bingham McCutcheon billed 855.2.  It is not surprising, therefore, that NPS contests the reasonableness of the hours reported by Patterson

Belknap.  NPS's protest rests on two grounds.  First, NPS claims that Patterson Belknap staffed the matter inefficiently, relying too heavily on senior attorneys with high hourly rates.  Second, NPS argues that Patterson Belknap's discovery practice caused an excessive escalation of costs because it was both unnecessary in light of its summary judgment motion and too broad in scope.  In total, NPS asks me to exclude $200,000 in unnecessary discovery costs.  However, after carefully reviewing the invoices provided by Patterson Belknap, I am satisfied that the hours expended, while perhaps exceeding the minimum amount required for success, were not unreasonable in the context of this case.

In determining whether the hours expended on a particular litigation are reasonable, I must rely upon "contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Disabled Patriots of Am., Inc.*, 688 F. Supp. 2d at 226 (quotation marks and citations omitted).  After reviewing the invoices and considering the arguments provided by the parties, I may exclude "excessive, redundant or otherwise unnecessary hours," *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999), or make an across-the-board reduction in the number of hours, *see Luciano* v. *Olsten Corp.*, 109 F.3d 111, 117 (2d Cir. 1997).  Such an examination must not rely on hindsight, but rather should

consider whether, "at the time the work was performed, a
reasonable attorney would have engaged in similar time
expenditures." *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d Cir.
1992).

Inefficient or top-heavy staffing of litigation can be
grounds for reducing an attorneys' fee request. *See Daiwa
Special Asset Corp.*, 2002 WL 31767817, at *4 (reducing the hours
used to calculate the fee award because the losing party
"inefficiently allocated work among attorneys"); *cf. HSH
Nordbank AG N.Y. Branch* v. *Swerdlow*, No. 08 Civ. 6131(DLC), 2010
WL 1141145, at *7 (S.D.N.Y. Mar. 24, 2010) ("The division of
labor among the attorneys was similarly appropriate.  The two
most junior attorneys conducted the bulk of the work, including
overseeing the document review, conducting the legal research,
and writing the initial drafts of pleadings and briefs.
Likewise, the junior partner billed twice the number of hours as
the more senior partner.").  In general, three Patterson Belknap
attorneys managed this case: David Dykhouse, a partner, billed
233.8 hours; Carrie Syme, a senior associate, billed 290.1
hours; and Nivritha Ketty, a junior associate, billed 565.5
hours.  The senior-most attorney billed only 0.9 hours.  Bingham
McCutcheon's lead attorney, Charles Solomont, was a more junior
partner than Dykhouse, although he billed a comparable 200.7

hours.  The great difference in total hours can be explained by
Patterson Belknap's decision to expend more hours generally and
to rely more heavily upon the services of a senior associate.
In general, however, the distribution of hours between partner,
senior associate, and junior associate was neither plainly top-
heavy nor unreasonable.

The question remains whether the fact that Patterson
Belknap billed so many more hours generally was unreasonable.
In arguing that it was, NPS points to Patterson Belknap's
discovery practice, which included extensive third-party
discovery, and its decision to initiate discovery and belatedly
move for summary judgment instead of moving to dismiss the case
from the outset.  A large expenditure of time on discovery can
be reasonably reflective of an unnecessarily broad discovery
request, as NPS contends was the case here.  *See HSH Nordbank AG
N.Y. Branch*, 2010 WL 1141145, at *6 (recognizing that inflated
attorneys' fees may result from "broad discovery demands").

Patterson Belknap did expend a considerable amount of time
and energy in pursuing third-party discovery and sparring with
Bingham McCutcheon regarding the scope and format of party
discovery.  However, NPS is not an innocent victim of this
hostile discovery practice.  As the briefing on the motion to
stay in this case indicates, both parties sought near limitless

25

discovery and contributed substantially to discovery skirmishes.
I will not at this point nit-pick the hours expended in this
process or question the perceived wisdom of engaging in such a
practice in the first place.  I am satisfied that Patterson
Belknap did not spend an unreasonable number of hours on
discovery given the combative nature of the litigation to that
point.

Finally, Patterson Belknap's strategic decision not to move
for dismissal in response to NPS's complaint is no basis for
reducing attorneys' fees.  Bingham McCutcheon rightly points out
that Ambac's summary judgment motion, in essence, argued that the
complaint failed to state a claim and relied largely on
materials attached to the complaint.  However, Ambac's motion
also sought summary judgment on its own counterclaim to enforce
the Guaranteed Premium provision in the Agreement.  Pursuing the
strategy suggested by NPS would not directly have achieved
Ambac's primary goal: the enforcement of the Guaranteed Premium
provision that NPS sought to avoid by bringing this lawsuit.
Furthermore, this action appears to be the first against Ambac
raising the claim of misrepresentation of its creditworthiness.
As NPS notes, other similar cases were filed subsequently and —
had Ambac not successfully reached the merits of NPS's arguments
— could, in the absence of a merits determination in this case,

have posed a heightened challenge to the validity of numerous insurance agreements integral to Ambac's business.  While the ultimate amount recovered under the Guaranteed Premium provision was not large in comparison to the fees expended, the validity of that provision and the Agreement in general rendered this case high stakes litigation for Ambac.  *See Amerisource Corp.* v. *Rx USA Int'l Inc.*, No. 02-CV-2514(JMA), 2010 WL 2160017, at *12 (E.D.N.Y. May 26, 2010) (finding that a large expenditure in attorneys' fees vis-a-vis the amount recovered was reasonable where "[i]t is likely that under such circumstances, other sellers would also hold their ground in order to demonstrate to their customers that debts cannot be escaped simply by raising expensive counterclaims and dragging out collection efforts"). Consequently, I find that the hours expended by Ambac's attorneys was not unreasonable and warrant no further reduction.

## C.   *Mediation Costs*

The parties agreed to attempt settlement of this case by mediation, but the one-day mediation on November 18, 2008 proved unsuccessful.  NPS now argues that Ambac is not entitled to recover any attorneys' fees or expenses related to the unsuccessful mediation.

In arguing that Ambac is not entitled to these fees and costs, NPS relies heavily upon *Janney Montgomery Scott LLC* v.

27

*Tobin*, 692 F. Supp. 2d 192 (D. Mass. 2010).  In *Tobin*, the court excluded attorneys' fees associated with a failed settlement negotiation because such fees "are not normally considered in the lodestar calculation" and "[t]o rule otherwise in a fee shifting regime would discourage parties from engaging in such negotiations because the losing party would have to pay for the prevailing party's fees." *Id.* at 198.  NPS thus argues that fees for mediation or settlement negotiations are not recoverable as a matter of policy.

However, *Tobin* is inapposite because it addresses attorneys' fees due under Chapter 93A and Massachusetts law in the context of a fee-shifting regime inapplicable here. *Id.* at 196, 198.  The provision for costs and attorneys' fees in this case states that NPS "will pay *all costs and expenses incurred by Ambac in connection with the enforcement of this Agreement* (including, without limitation, all reasonable fees and disbursements of Ambac's counsel)." (Agreement § 1.03 (emphasis added).)  This is not a case involving a statutory fee-shifting provision entitling the prevailing party to attorneys' fees. The Agreement clearly states that Ambac is entitled to recover all expenses incurred in enforcing the Agreement.  Under the Agreement, NPS would not be entitled to attorneys' fees even if it had prevailed in its action.  Therefore, the policy concerns

28

regarding the inducements or disincentives to reach a settlement outlined in *Tobin* do not apply.  In fact, denying attorneys' fees incurred in the reasonable pursuit of mediation or settlement in contract disputes would provide a significant disincentive for such alternative dispute resolutions.  The policy implications relevant to the agreement suggest that mediation or settlement costs — regardless of success — should be included in an award of reasonable attorneys' fees and costs.[9]

NPS has failed to identify a single court applying New York law that has held that expenses related to mediation or settlement negotiations are not recoverable under contractual attorneys' fees provisions.  By contrast, research has revealed that New York courts have permitted just such recovery.  *See, e.g.*, *Thompson* v. *McQueeney*, 868 N.Y.S.2d 443, 448 (N.Y. App.

---

[9] Federal district courts in New York that have rejected the opposing policy approach regarding settlement fees taken in *Tobin*.  *See Stirrat* v. *Ace Audio/Visual, Inc.*, No. 02 CV 2842(SJ), 2007 WL 2229993, at *6 (E.D.N.Y. July 31, 2007) (permitting reimbursement for "typical pretrial tasks (pleadings, discovery practice, *mediation, and settlement discussions*)" (emphasis added)); *Moses* v. *New York City Transit Auth.*, No. 01 Civ. 4280RMBMHD, 2003 WL 22939122, at *3 (S.D.N.Y. Dec. 12, 2003); *Sugarman* v. *Village of Chester*, 213 F. Supp. 2d 304, 311-12 (S.D.N.Y. 2002) ("While we would not expect that a plaintiff would expend an inordinate amount of time on unsuccessful settlement negotiations, . . . [we] conclude that [the plaintiffs] are entitled to reimbursement for their reasonable settlement efforts.").

Div. 2008) ("[I]nasmuch as the Agreement expressly allows

reimbursement for attorneys' fees 'incurred in connection' with

litigation involving that document, it cannot be said that the

fees incurred in an attempt to settle that litigation were not

in fact a part of that litigation."); *Tige Real Estate Dev. Co.,*

*Inc.* v. *Rankin-Smith*, 650 N.Y.S.2d 114, 115 (N.Y. App. Div.

1996) (memorandum decision) ("The court also correctly ruled

that fees incurred in settlement negotiations are recoverable."

(citation omitted)).

Consequently, I find that Ambac is entitled to recover

reasonable attorneys' fees and expenses related to the mediation

in this case.  *See Sugarman* v. *Village of Chester*, 213 F. Supp.

2d 304, 312 (S.D.N.Y. 2002) ("While we would not expect that a

plaintiff would expend an inordinate amount of time on

unsuccessful settlement negotiations, . . . [we] conclude that

[the plaintiffs] are entitled to reimbursement for their

reasonable settlement efforts.").

Accordingly, with the exception of the travel expenses and

fees discussed above, I am satisfied that the hours and expenses

expended on the mediation are reasonable and recoverable.

**D.  *Conclusion***

In light of the foregoing analysis, I must calculate the

resulting attorneys' fees and expenses due.  Using the reduced

hourly rates for Patterson Belknap's attorneys, I have calculated
the total reasonable attorneys' fees and costs to be $584,658.02
($550,022.03 for Patterson Belknap,[10] $24,028.00 for DLA Piper,
and $10,607.99 for McDermott).  I further reduce this amount by
the $13,506.31 in travel expenses incurred because Ambac did not
hire in-district counsel and reduce it by a further $655.57 in
expenses for local cab rides and meals billed by Patterson
Belknap.  While Ambac may have been willing to pay such
additional costs, NPS need not shoulder them.  *See Daiwa Special*

---

[10] The following chart details the base amount for Patterson Belknap:

| Patterson Belknap Attorney | Reduced Hourly Rate | Total Number of Hours | Total Fees |
|---|---|---|---|
| Forlenza | $742.50 | 0.9 | $668.25 |
| Dykhouse | $657 | 233.8 | $153,606.60 |
| Syme | $491.40 | 290.1 | $142,555.14 |
| Larsen | $426.60 | 25.5 | $10,878.30 |
| Devine | $396 | 1.8 | $712.80 |
| Ketty | $329.40 | 565.5 | $186,275.70 |
| Staff | $172 | 44.4 | $7,636.80 |
| Total | | 1162 | $502,333.59 |

I further discount this base amount by two percent to account
for the unnecessary communication and consultation with
McDermott as local counsel. *See supra* Part II.A.2.  After
adding the $57,735.11 in expenses claimed by Patterson Belknap,
the resulting total of Patterson Belkap's recoverable fees and
expenses is $550,022.03.

*Asset Corp.*, 2002 WL 31767817, at *2.  Under my calculations, therefore, the total amount due to Ambac under § 1.03 of the Agreement for attorney fees and costs is $570,496.14.

### IV. CONCLUSION

For the reasons laid out more fully above, I will enter judgment for Ambac including (A) $2,740,432.18 in damages for its breach-of-contract counterclaim, plus interest accrued through March 15, 2010 of $290,067.13 and interest as accrued thereafter calculated under § 2.03 of the Agreement to the date of judgment; (B) $570,496.14 in attorneys' fees and expenses,[11] plus interest accrued after March 15, 2010 to the date of judgment; and (C) any post-judgment interest under the Agreement.[12]

---

[11] New York law provides for pre-judgment interest on contractual attorneys' fees. *CARCO GROUP, Inc*. v. *Maconachy*, 718 F.3d 72, 87-88 (2d Cir. 2013) (per curiam).  I conclude such interest is available and appropriate here under a contract that provides for interest on all "amounts payable hereunder," Agreement § 2.03, to assure compensation for the time value of money awarded in a judgment, the entry of which has been deferred.

[12] While in a diversity action applying New York law, New York law governs the award of pre-judgment interest, the award of post-judgment interest is properly understood as a procedural matter governed by federal law.  *FCS Advisors, Inc*. v. *Fair Fin. Co*., 605 F.3d 144, 146 (2d Cir. 2010) (per curiam); *see also Westinghouse Credit Corp.* v. *D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004).  Federal statute provides a default post-judgment interest rate, 28 U.S.C. § 1961, but parties may contract around that rate using unequivocal language.  *Id.; see also Venture Partners LLC* v. *River Rim LLC*, No. CIV. 07-213-P-H, 2008 WL

I direct the parties jointly to submit on or before June 10, 2016 agreed-upon figures bringing prior calculations for the amount of prejudgment interest up to the anticipated June 17, 2016 date for entry of final judgment, thereby providing a calculation of the total amount of that final judgment as of that date.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

355561, at *1 n.3 (D. Me. Feb. 8, 2008) (citing Second, Seventh and Fifth Circuits in the absence of clear First Circuit precedent).  The language in the Agreement here unambiguously provides for interest at the contractual rate "after as well as before judgment."  Agreement § 2.03.  Accordingly, post-judgment interest will accrue at the contractual rate until the judgment is fully paid.